Filed 11/9/23  In re A.G. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>     Plaintiff and Respondent,<br>v.<br>SARAH K.,<br><br>     Defendant and Appellant. | A168126<br><br>(Sonoma County<br>Super. Ct. No. DEP5995-03) |

Sarah K. (Mother) appeals from the juvenile court order terminating her parental rights as to her daughter A.G. (Minor).  She argues that the juvenile court erred in concluding that she had not demonstrated that the beneficial parental relationship exception (Welfare and Institutions Code, section 366.26, subdivision (c)(1)(B)(i)) applied in her case to preclude the termination of parental rights.[1]  We affirm.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The parties have adopted our previous summary of the factual and procedural background of this dependency matter from its beginning through Mother's petition for writ relief from the dependency court's July 2022 order setting a section 366.26 permanency planning hearing. (See *Sarah K. v. Superior Court* (A165607, Jan. 17, 2023) [nonpub. opn.] [denying writ petition].) We do not repeat that background here, except to state that Minor was 11 months old in September 2019, when the Sonoma County Human Services Department (the Department) filed a dependency petition on her behalf alleging risk of serious physical harm (§ 300, subd. (a)) and failure to protect (§ 300, subd. (b)(1)). (*Sarah K.*, *supra*.) Minor has been in foster care since September 2020. (*Ibid.*)

While Mother's writ petition was pending, Mother asked the juvenile court to authorize a bonding study to evaluate the attachment between Mother and Minor to assist her in establishing the applicability of the parental benefit exception to the termination of parental rights under the guidelines described in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).[2] Minor's counsel filed an opposition to the request. The juvenile court denied the request, but permitted Mother's proposed expert, Dr. Dana Oertel, to observe two visits between Mother and Minor, and Dr. Oertel did so.[3]

---

[2] A parent must demonstrate three elements to show that the parental benefit exception applies: first, that "the parent has maintained regular visitation and contact with the child" (*Caden C.*, *supra*, 11 Cal.5th at p. 625); second, "that the child has a substantial, positive, emotional attachment to the parent" (*id.* at p. 636); and third, "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Ibid.*)

[3] Mother does not argue on appeal that the juvenile court erred in denying her request for a bonding study. Also while her writ petition was

On April 28, 2023, our Supreme Court denied Mother's petition for review of our denial of her writ petition (S278324). A contested section 366.26 hearing took place over two days in May and June 2023.

A. *The Department's Evidence*

1. *Reports*

In advance of the section 366.26 hearing, the Department filed a "366.26 WIC Report" in October 2022 and two addendum reports, one in January 2023 and one in February 2023, all of which were admitted into evidence.

The Department recommended that the court terminate parental rights and order a permanent plan of adoption. The Department reported that Minor had been placed with her concurrent substitute care providers in June 2021. The foster family had an approved adoption home study, and were committed to adopting Minor.

The Department described Minor as a "bright and active child" who was "very outgoing and affectionate" in all settings. She lacked awareness of "stranger danger" and would potentially obey anyone who is friendly to her. Minor continued to show anxious behaviors and the Department stated that her previous exposure to emotional abuse, physical neglect, and substance abuse put her at a higher risk for emotional and cognitive impairment, adoption of health-risk behaviors, disease, disability, social problems, and early death. The Department opined that Minor's "need for stable attachment and permanence is critical and urgent."

---

pending, Mother filed a petition under section 388 asking the court to return Minor to Mother's custody, which was heard and denied at the section 366.26 hearing. Mother does not present any argument concerning the juvenile court's ruling on her section 388 petition.

3

The Department addressed at some length the *Caden C.* factors relevant to the parental-benefit exception to the termination of parental rights.

With respect to regular visitation and contact, the Department reviewed the history of Mother's visitation with Minor, stating that Mother has good attendance; the visits have been routine with predictable beginnings and ends; Mother and Minor play together, and Minor enjoys the one-on-one attention; and Mother is "particularly affectionate with [Minor], which [Minor] accepts."

Under the heading, "Does the Child Benefit from Continuing the Relationship?" the Department primarily addressed the question whether Minor was "significantly emotionally attached" to Mother, which the Department viewed as a first step in determining whether there is benefit. The department opined that Minor was not significantly emotionally attached to Mother based in part on the fact that Minor was four years old and as of October 2022 had lived out of Mother's care for two years, with the first 10 months of that time spent in an emergency foster home and the rest in her concurrent foster home. In addition, Minor did not ask about visits with Mother in between visits, and was happy to see her foster mother at the end of visits, typically jumping into her arms. Minor looked to her foster parents "for her basic needs, for comfort and for reassurance." Minor appeared to the social worker to be confused about her family situation, and the social worker believed Minor would "respond well to a decision being made about her future family." Minor asked her foster parents "questions looking for security and answers about her future," but they "cannot always say yes to her questions" because of the status of the court proceedings. Minor was comfortable with Mother, and most of the time she would accept

affectionate touches from Mother or participate in the affection during the visits, but Minor was comfortable with other adults as well. Minor saw Mother as " 'mommy' and a fun person to visit and play with" but continued to thrive without Mother as part of her daily life. The Department observed that Minor "seems to enjoy her visitation, which shows there is some benefit to her relationship with" Mother.

Under the heading, "Would Termination of Parental Rights Be Detrimental to the Child due to the Relationship?" the Department opined that if parental rights were terminated and Minor had no further contact with Mother, Minor would not experience detriment. Minor needed security and stability, and given Minor's attachment to her foster family and a "comparatively weaker relationship with" Mother, the Department opined that Minor "would not only be fine, but . . . would continue to thrive if parental rights were terminated." The Department opined that adoption would bring Minor stability and solidify her sense of permanence and well-being, and that Minor's relationship with Mother was "not so strong that it would be detrimental to legally remove [Mother's] parental rights." The Department concluded that although interaction between Mother and Minor "could have some incidental benefit, such benefit does not outweigh the benefit that will be gained through the permanence of adoption," and that the termination of parental rights would not be detrimental to Minor.

The Department also addressed Minor's relationship to the prospective adoptive parents and the effect on Minor if parental rights were not terminated and she were not adopted. The Department reported that Minor "actively seeks connection" to the foster parents, and during a recent home visit asked the foster mother to join her on the couch for "cuddles." The Department reported that Minor had been embraced as part of her foster

5

family, which included two daughters a few years older than Minor; that the family has "attended to all her physical and emotional needs" since she was placed with them in June 2021; that she appeared happy in the home and "very settled in the family"; and that she was "developing substantial emotional ties" to the foster parents.[4]  The Department opined that removing Minor from the foster parents would be detrimental to her wellbeing.  The Department also opined that a legal guardianship, as an alternative to adoption, would allow "the option for [Minor] to be uprooted once again in the future, which would not be in her best interest at this young and vulnerable age."

2.    *Social Worker Testimony*

Social worker Ashley Kirkland, the author of the three reports that were admitted into evidence, was designated without objection as an expert in social work, specifically with respect to adoption and permanency planning, and testified about her work on Minor's case since being assigned to the matter in August 2022.

---

[4] Minor's foster parents filed four Caregiver Information Forms (Judicial Council forms JV-290) during the court of the dependency. According to their most recent report, filed in October 2022, Minor, then four years old, continued to exhibit some behavioral and emotional problems after her supervised visits with Mother, including appearing anxious, not listening and acting out with her gymnastics teacher, and demonstrating regressive behavior.  They also informed the court that Minor expressed eagerness to attend elementary school with her foster sisters and that Minor's preschool teacher reported that Minor was doing well.  They stated that Minor was fully integrated into their family, "idolizes her two big sisters," was close to both foster parents, and had "no conscious memory of living with any person or family other than ours," and that they were "eager to be able to provide her with real permanency."

Kirkland testified that she had observed Mother's monthly visits with Minor in February, March, and April 2023, which occurred after her most recent written reports had been submitted to the court. There were no notable differences between the visits, which lasted from 50 minutes to an hour. The visits would start with the foster mother bringing Minor, who was usually in her arms. Sometimes Minor was shy at first and did not want to get out of the foster mother's arms, but other days she would jump out of her arms. Minor and Mother would then embrace or walk to the visit without incident. In all the visits Minor talked about her foster family. And in all the visits, Mother was appropriate. At the end of the visits, Minor would go to the foster mother, jump back in her arms, and would typically have a quick goodbye, although sometimes Minor was not engaged in a goodbye—she would be moving quickly to be on her way to the foster parent, to go to the car and go somewhere else.

Kirkland testified that between visits, Minor does not ask to see Mother or ask for more visitation time with mother. One time, at the end of the most recent visit, when Minor was told it was time to clean up, she yelled "no," but then the clean-up proceeded and Minor left without incident. Kirkland believed that Minor cried out "no," because "she was running around the room at that time and then in the moment and enjoying herself." Kirkland testified that during visits, Minor and Mother are affectionate toward each other, and Minor calls Mother "mommy." Kirkland testified that nothing she observed in the visits caused her to change the opinion stated in the written report that there was not a significant emotional attachment between Minor and Mother.

Kirkland testified that she had observed Minor in the foster home about seven times, for at least an hour each time. Minor seemed comfortable

in the home and was "part of a threesome" with her two older foster sisters. She observed that Minor was very close to the sisters, looked up to them, mentioned them frequently when she was not with them, including during her visits with Mother, and appeared to be developing her own identity with them in mind. She observed that Minor was physically affectionate toward her foster parents and sought their attention. Kirkland testified that Minor frequently mentioned all the members of the foster family when she was not with them, and talked about them in a way that suggested to Kirkland that Minor was developing a sense of identity through that family. Minor did not talk about Mother in the same way. When Minor was shown photographs of herself with a former foster family, she did not remember those people or why she was with them.

Kirkland testified that at one point, she asked Minor to draw a picture of her family. The picture included Minor's foster family and Mother, with Mother drawn "differently" from the rest of the people. Kirkland testified that she had been told that Minor sometimes refers to Mother as her "belly mommy"; and that with respect to the drawing, Minor called Mother "the belly," presumably reflecting Minor's understanding that at some point she was in Mother's belly.

Kirkland opined that there was not a substantial positive relationship between Mother and Minor "as defined by *Caden C.*," based on her observation that Minor left visits with Mother without crying, went about her daily life "without bringing mother up," and did not ask for more visits. Kirkland stated that her opinion concerned the relationship between Mother and Minor, regardless of the relationship between Minor and her foster parents, and rested on Kirkland's having come to know Minor and observing her in different situations. Kirkland testified that Minor was outgoing and

affectionate in all settings, and did not "have a lot of boundaries with other people," including teachers and friends she had met for the first time with the foster family. Minor wanted to sit on people's laps quickly, and wanted hugs and kisses from people she just met. Kirkland testified that Minor was affectionate with other adults with whom she was comfortable in the same way as she was affectionate with Mother, and thought that Minor viewed Mother as a "friendly visitor," much as she viewed others with whom she was comfortable, including her preschool teacher's aide, her previous social worker, visitation supervisors whose names she had learned, and Kirkland herself. Kirkland opined that these friendly and affectionate interactions did not amount to a significant emotional attachment.

Kirkland also opined that although Minor enjoyed her visits with Mother, if visits between Minor and Mother were to stop, Minor would not experience any detriment, because Minor did not ask about Mother between visits and all Minor's needs were being met in her current placement. Kirkland further opined that it would be detrimental to remove Minor from her foster home, based on Kirkland's assessment of how Minor sees her life and who she is most closely connected to. She felt that disruption of the bond between Minor and her foster family would have serious long-term emotional consequences for Minor. And Kirkland opined that adoption would be the best permanent plan for Minor, because it would be the most stable from a legal perspective. Kirkland stated that in her view the disruptions in Minor's life before she was placed with her foster family made it important for Minor to have the permanency of adoption.

9

B.      *Mother's Evidence*

   1.      *Documents*

Mother offered eight exhibits that were admitted into evidence:  Dr. Oertel's notes from observing two visits between Minor and Mother in November and December 2022; a photograph of a hair follicle test result from March 2023 showing negative results except for THC metabolite; a copy of Mother's December 2022 section 388 petition, including her supporting declaration; and five photographs of Minor, most of which showed Minor with Mother.

Dr. Oertel observed that Minor transitioned easily from her foster mother to Mother and then back again at the end of the visits, without engaging in any "goodbyes" with Mother.  Mother and Minor were affectionate with each other, and engaged physical play and in activities such as puzzles, drawing, and coloring.  Mother was encouraging and supportive of Minor's efforts, and redirected Minor and set boundaries when Minor engaged in mild misbehavior.  Minor referred to Mother as "mom" during the first visit, and referred to foster Mother as "mommy" and "mom" during the second.  During the first of the visits, both Minor and Mother initiated snuggling and physical affection, with Minor sometimes reciprocating Mother's affection and sometimes indifferent to it; during the second visit Mother initiated hugging and kissing, and Minor did not reciprocate as much as at the previous visit.

In her declaration, Mother stated her visits with Minor went well; that they played together and were affectionate; that Minor called her "mama"; that they had a bond; and that during their visits Minor talked to her about things they did on past visits.

10

2. *Mother's Testimony*

Mother testified about her current circumstances, stating that she had obtained safe, stable housing; was studying for an associate's degree; saw a psychiatrist once a month and took medication to treat her mental health issues; was no longer using methamphetamine; was attending meetings to support her sobriety; and that her recent tests were positive for THC because she was using cannabis with oversight from her psychiatrist.

Mother testified that her most recent visit with Minor was fun, and that Minor came right to her. Mother testified that sometimes when Minor has not seen her for a month, the transition can be more difficult, but things go well after the transition. Mother testified that usually during the visits they do puzzles or make up a game, and that Minor likes Mother to give her piggy-back rides and run around. Mother corrects Minor when she does something she shouldn't, and Minor responds well to that. At the most recent visit, Minor did not want the visit to end.

Mother testified that during the visits, Minor shows affection for her by sitting on her lap and asking for nose kisses or back rubs. Minor testified that during the visits Minor talks about her foster sisters, foster mother, and foster father, and agreed that Minor was close to them. She recognized that Minor had "built a bond" with the foster family, and that the foster family were "special people to her." As to her own bond with Minor, Mother testified that there was a "substantial bond" between them because "I am her mother. She grew in my body. She has my blood flowing through her veins." Mother concluded her testimony by saying that she thought it was in Minor's best interest to be returned to her.

11

C.    *Rebuttal Evidence and Argument*

On the second day of the hearing, held about three weeks after the first day, at which Mother had testified, the Department called social worker Kirkland as a rebuttal witness. She testified that she had reviewed Dr. Oertel's notes, which had been introduced into evidence at the previous session, and they did not change her opinion. She also testified that Minor was not negatively affected when visits with Mother did not occur, although she had never directly asked Minor how she feels when visits are cancelled. Kirkland described a visit between Mother and Minor that occurred the previous week. Mother, Minor, and Kirkland went to a park, where Mother and Minor played and then sat at a picnic table and ate. Minor sat on Mother's lap while they were eating. Kirkland observed them to be affectionate toward one another, as was typical for them. At the end of the visit, as they walked to the parking lot, Minor saw her foster Mother's car, and exclaimed, "that's my mom's car," and began running toward the car. She was redirected to the lobby where the foster mother was waiting, greeted her foster mother, and the visit ended without any issues.

After the evidence was presented, the juvenile court heard argument. The attorneys representing the Department and Minor argued that the court should terminate parental rights and select adoption as the permanent plan. Mother's attorney argued that because of the bond between Mother and Minor, the parental benefit exception to the statutory preference for adoption applied to this case, and therefore, the court should order a guardianship and not terminate parental rights.

D.    *Findings and Orders*

The juvenile court found by clear and convincing evidence that it was likely Minor would be adopted.

12

The court addressed the parental benefit exception to the statutory preference for termination of parental rights and adoption, and concluded that Mother had not met her burden to demonstrate the three elements set forth in *Caden C.*, *supra*, 11 Cal.5th 614.

The court began, "So the issues, then, that I have to address are[,] have there been regular consistent visits?  Yes.  In the last two years there have been regular and consistent visits.  The visits are good."

The court then turned to the second and third elements.  The court observed that in evaluating whether Minor had "a substantial positive emotional attachment to" Mother, the court was conducting the analysis that was required by case law, and made clear that a finding of no such attachment would not be finding that Minor did not like Mother.  The court stated that in evaluating Minor's attachment, it considered Minor's age, which was four years and nine months, and that Minor had been removed from Mother's care at the age of two, in September 2020, and therefore had been out of Mother's care for almost three years.  Minor had been in her existing, concurrent placement for two years, since June 2021, and had some recognition that she had a "belly mom" as well as the foster mother with whom she lived.  Minor was outgoing and affectionate, including to Mother, with whom she had positive visits—Mother and Minor loved each other.  The court found that Mother was "a friendly, positive part of the household," based on the social worker's opinion that Minor experienced Mother as a friendly visitor or extended family member and based on Minor's drawing of her family that included Mother, the foster parents, and the foster sisters.

The court found that Minor was attached to Mother and "also is very attached to her foster family."  She looked to them to meet her needs, transitioned easily back to them after visits, and was emotionally attached to

13

them. The court concluded that "because of the time that's elapsed and the nature of the relationship that [Minor] has with the foster family . . . it would be detrimental to [Minor] to disrupt her attachment" to the foster family. The court went on, "[T]aking her away from them would be devastating to her, I believe."

The court summed up by saying, "I don't find that the *Caden C.* factors are met. [¶] I don't find that her relationship . . . with [Mother] . . . is such an attached substantial nature that it would be detrimental to terminate parental rights. And I think it's very important for her, at this stage of her life and all of the things that she's been through, . . . only a few of which I've mentioned right now, but that she needs to have permanence. She needs to have her place solidified in the family where she's securely attached so that she can grow up to be a healthy, secure adult. So that's—I don't find that the parental benefits exception applies."

The court terminated the parental rights of Mother and any known or unknown fathers, and ordered adoption as the permanent plan.[5]

Mother timely appealed.

## DISCUSSION

A. *Applicable Law and Standard of Review*

We summarized the applicable law in *In re Eli B.* (2022) 73 Cal.App.5th 1061 (*Eli B.*):

"The beneficial relationship test is an exception to the presumptive rule of terminating parental rights after reunification efforts have failed, in order

---

[5] Minor's father (Father), whose status was never elevated beyond that of a biological father, is not a party to this appeal. At the section 366.26 hearing, his counsel informed the court that Father supported Mother's opposition to the termination of parental rights.

to free a child for adoption.  (*In re J.D.* (2021) 70 Cal.App.5th 833, 852 (*J.D.*).)
. . . [T]he Supreme Court has recently explained its scope and proper
application.  (See generally *Caden C.*, *supra*, 11 Cal.5th 614.)

"As clarified by the Supreme Court, ' "the parent asserting the parental
benefit exception must show, by a preponderance of the evidence, three
things.  The parent must show regular visitation and contact with the child,
taking into account the extent of visitation permitted.  Moreover, the parent
must show that the child has a substantial, positive, emotional attachment to
the parent—the kind of attachment implying that the child would benefit
from continuing the relationship.  And the parent must show that
terminating that attachment would be detrimental to the child even when
balanced against the countervailing benefit of a new, adoptive home.  When
the parent has met that burden, the parental-benefit exception applies such
that it would not be in the best interest of the child to terminate parental
rights, and the court should select a permanent plan other than adoption." '
(*J.D.*, *supra*, 70 Cal.App.5th at p. 852, quoting *Caden C.*, *supra*, 11 Cal.5th at
pp. 636-637.)

"We review the juvenile court's ruling on the first two elements for
substantial evidence.  (*J.D.*, *supra*, 70 Cal.App.5th at p. 853.)  We review its
ruling on the third element under a hybrid standard, reviewing its factual
determinations concerning the detriment analysis for substantial evidence
but its ultimate weighing of the relative harms and benefits of terminating
parental rights for an abuse of discretion.  (*Ibid.*)"  (*Eli B.*, *supra*, 73
Cal.App.5th at pp. 1067-1068.)

Under the substantial evidence standard "we inquire whether the
evidence, contradicted or uncontradicted, supports the court's determination.
We resolve all conflicts in support of the determination, indulge in all

legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court." (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865.) We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) We uphold the juvenile court's findings if they are " 'supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Ibid.*) In reviewing for abuse of discretion, we reverse "only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

Although a juvenile court's statement of its findings or explanation of the reasons for its decisions may help in conducting appellate review, there is no requirement that the juvenile court, if it finds the parental-benefit exception does not apply, must recite specific findings as to "any or all of the three elements of the exception." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 (*A.L.*).) We " ' "indulge in every presumption to uphold a judgment." ' " (*id.* at p. 1161), including that the court "considered all the pertinent matters presented to it and ruled in favor of the prevailing party." (*Lydig Construction, Inc. v. Martinez Steel Corp.* (2015) 234 Cal.App.4th 937, 945.)

B.     *Analysis*

The first element of the parental benefit exception is not in dispute: the trial court found, and the parties agree, that Mother demonstrated that she had regular visitation and contact with Minor. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Mother's argument on appeal focuses on the second element of the *Caden C.* analysis, which requires the parent to show "a substantial, positive,

16

emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) In assessing the relationship, courts must focus on the child and may consider "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.) Mother contends that the Department's report "was silent as to any benefits" to Minor of maintaining a relationship with Mother, and argues that the trial court was required to, but did not, consider whether Minor would benefit from continuing her relationship with Mother before finding that the parental benefit exception did not apply. We disagree with Mother's characterization of the record.

Contrary to Mother's assertion, the Department recognized in its report that Minor's enjoyment of her visits with Mother "shows there is some benefit to her relationship," and acknowledged "some incidental benefit" to continued interaction between Minor and Mother.[6]

---

[6] Mother also contends that the Department's report "engaged in an impermissible comparison of [Minor's] attachment to her birth mother and her foster mother." She cites no authority to support her contention that such a comparison in the Department's report would be improper. And in any event, the Department was required by statute to include in the assessment it prepared for the section 366.26 hearing discussion of "[t]he relationship of the child to any identified prospective adoptive parent . . ., the duration and character of the relationship, [and] the degree of attachment of the child to the prospective . . . adoptive parent." (§ 366.25, subd. (b)(1)(E).) Notably, neither the Department nor the court "compar[ed] the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)," which would not be an appropriate consideration in weighing whether termination of parental rights would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 634 ["the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver"].)

And we see no basis for Mother's contention that the trial court failed to consider whether there was any benefit to Minor of continuing her relationship with Mother. The trial court was not required to state on the record that there would be some benefit to Minor in continuing her relationship with Mother, or make any statement qualifying or quantifying any such benefit. (*A.L.*, *supra*, 73 Cal.App.5th at p. 1156.) The record shows that, contrary to Mother's assertion, the juvenile court considered whether Minor would benefit from continuing the relationship: the court impliedly recognized some benefit to Minor in continuing the relationship, when it concluded that, as the Department had opined, Minor thought of Mother as an extended family member, or a friendly, positive part of the household.

Here, the juvenile court summed up its findings on the second and third elements by stating that Minor's relationship with Mother was not of "such an attached substantial nature that it would be detrimental to terminate parental rights." The court stated that in light of Minor's experiences, Minor needed permanence and "to have her place solidified in the family where she's securely attached"; that the parental benefit exception did not apply; and that adoption would be Minor's permanent plan. In reaching its conclusions, the juvenile court necessarily considered whether continuing Mother's relationship with Minor would benefit Minor to such an extent that the relationship should preclude the permanency and stability of adoption. Although the juvenile court impliedly found that there would be some benefit to Minor in continuing the relationship with Mother, the court nevertheless determined that the benefit was outweighed by the benefits to Minor of adoption.[7]

---

[7] In her opening brief, Mother suggests that under *Caden C.* a conclusion by the juvenile court that the parental benefit exception does not

18

Mother contends that instead of evaluating Minor's relationship with Mother, the juvenile court's "primary focus" was on whether Minor would benefit from continuing her relationship with the foster family. We disagree. It is true that in explaining its ruling, the juvenile court discussed not only Minor's attachment to Mother, but also Minor's attachment to her foster family, and found that although it would not be detrimental to Minor to disrupt her attachment to Mother, it would be detrimental to disrupt her attachment to the foster family. Discussion of Minor's attachment to the foster family does not negate or undercut the trial court's conclusion that Minor's relationship with Mother was not of "such an attached substantial nature that it would be detrimental to terminate parental rights." (See *Caden C.*, *supra*, 11 Cal.5th at p. 640 [in determining whether termination of parental rights would be detrimental, "[t]he court must . . . determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms" and must "assess[ ]what the child's life would be like in an adoptive home without the parent in his life"].)

At the time of the section 366.26 hearing Minor was almost five years old, and she had been out of Mother's custody for almost three years, since she was almost two. There was undisputed evidence that Minor had positive visits with Mother, and viewed Mother as a friendly part of her extended family. But there was also undisputed evidence that Minor transitioned back to her foster family without incident after her monthly visits with Mother, and that between the visits Minor did not ask to see Mother or ask for more visitation time with her.

---

apply requires a finding by the juvenile court "that continuation of the relationship [with Mother] would not benefit" Minor. That is not the law.

There was undisputed evidence that in light of her past, Minor had a need for stable attachment and permanency, which adoption could provide. The Department reported that Minor was at risk for "insecure attachment" but was nevertheless "open to new attachments, attention and parenting from new people," and "able to develop a secure attachment to her foster parents." And the Department opined that Minor's "need for stable attachment and permanency is critical and urgent."

Against this background, Mother points to no evidence that terminating her parental rights would be detrimental to Minor. In these circumstances, Mother has not shown any error in the juvenile court's determination that any benefit to Minor in continuing her relationship with Mother was outweighed by the benefit to Minor of the permanence and security of a new adoptive home.

## DISPOSITION

The order terminating Mother's parental rights is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Stewart, P.J.


_____
Richman, J.


A168126, *Sonoma County Human Services Department v. Sarah K.*